UNITED STATES of America

v.

**FRIEDLAND, David, Appellant in No. 80–2052**

UNITED STATES of America

v.

**FRIEDLAND, Jacob, Appellant in No. 80–2053.**

Nos. 80–2052, 80–2053.

United States Court of Appeals, Third Circuit.

Argued July 23, 1981.

Decided Oct. 1, 1981.

Rehearing and Rehearing In Banc Denied Nov. 10, 1981.

Raymond A. Brown (argued), Raymond M. Brown and Henry F. Furst (on the brief), Brown, Brown, Furst, P. C., Newark, N.J., for David Friedland.

Franklin M. Sachs (argued), Podvey & Sachs, P. C., Newark, N.J., for Jacob Friedland.

Samuel A. Alito, Jr. (argued), Asst. U. S. Atty., William W. Robertson, U. S. Atty., Maryanne Trump Desmond, Asst. U. S. Atty., Newark, N.J., for appellee.

Before ADAMS, HUNTER and SLOVI-TER, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge.

The appellants, David and Jacob Friedland, were convicted of soliciting and accepting kickbacks in their capacity as general counsel to the Teamsters' Local 701 Pension Fund in North Brunswick, New Jersey ["the Fund"], in violation of 18 U.S.C. § 1954 (1976);[1] obstructing justice by soliciting another to give false testimony before the grand jury investigating the kickbacks, in violation of 18 U.S.C. § 1503 (1976);[2] and filing false income tax statements for the years in which they received the kickbacks, in violation of 26 U.S.C. § 7206(1) (1976).[3]

This appeal raises the following issues:

a) Must appellants be shown to have duties with respect to the pension fund in order to come within the scope of 18 U.S.C. § 1954? Must appellants have committed any acts in order to be found to have solicited or accepted payment "because of" their actions, decisions, or other duties relating to the Fund?

b) Did the trial court err in refusing to conduct an evidentiary hearing concerning the alleged loss or destruction of discoverable evidence by the Government?

c) Did the trial court err in allowing certain exhibits in the jury room?

Did the trial court err in finding that the Government's opening statements were not prejudicial?

Did the trial court err in permitting the introduction of evidence concerning appellants' secret Swiss bank account?

Did the trial court err in refusing to conduct an inquiry into appellants' allegation that the jury improperly considered appellants' failure to testify?

---

1. 18 U.S.C. § 1954 provides:

   Whoever being ... counsel ... of any employee welfare benefit plan or employee pension benefit plan receives or agrees to receive or solicits any fee, kickback, commission, gift, loan, money, or thing of value because of or with intent to be influenced with respect to, any of his actions, decisions, or other duties relating to any question or matter concerning such plan ... shall be fined not more than $10,000 or imprisoned not more than three years, or both ....

2. 18 U.S.C. § 1503 provides:

   Whoever ... corruptly or by threats of force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

3. 26 U.S.C. § 7206(1) provides:

   Any person who ... [w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter ... shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $5,000, or imprisoned not more than 3 years, or both, together with the costs of prosecution.

d) Must an indictment charging a violation of 18 U.S.C. § 1503 for obstruction of justice, which is based upon the solicitation of false statements, specify the false statements allegedly solicited?

e) Did the trial court err in denying appellants' motion for a new trial?

We have reached the following conclusions:

a) Implicit in the finding that appellants were counsel to the Fund is a finding of sufficient duties to bring them within the scope of § 1954. Appellants need not have committed any acts in order to violate the "because of" provision of § 1954; it is sufficient that they accepted payment with the stated purpose of exercising their influence over the Fund.

b) Appellants failed to show the existence or relevance of the documents in question; thus, an evidentiary hearing was not warranted.

c) The trial court did not err in finding that the presence of challenged exhibits in the jury room, and the Government's opening statements, did not prejudice appellants.

It was not arbitrary or irrational for the trial court to find that the probative value of the Swiss bank evidence outweighed the danger of prejudice therefrom.

The trial court did not err in finding that the inquiry requested by appellants into jury deliberations was prohibited by Fed.R.Evid. 606(b).

d) An indictment for obstruction of justice need not meet the same specificity requirements as an indictment for making false statements, even though the obstruction of justice count is based upon solicitation of false statements.

e) The trial court carefully considered all the evidence on the record before denying the motion for a new trial. We cannot say that the court abused its discretion in doing so.

Therefore, we affirm the judgment of the trial court in all respects.

FACTS

David Friedland and his father, Jacob, are attorneys who served for many years, up to and including 1976, as general counsel to the pension fund maintained by Teamsters' Local 701 of North Brunswick, New Jersey. Trial Transcript at 63. That fund was an employee benefit plan within the meaning of 18 U.S.C. § 1954. In their role as counsel, the Friedlands were obligated to consult with the trustees of the Fund when requested, and were required to attend and provide advice at all trustees' meetings. Although the trustees employed an investment manager to oversee investment of the Fund's assets, the trustees retained significant authority over investments. The trustees had the responsibility for selecting the manager and for deciding, when the management contract expired, whether to continue the manager's services or to seek a replacement. The trustees also had complete discretion to direct particular investments at any time.

Until 1974, the Fund's investments had been managed by Lionel D. Edie & Co. Because of their dissatisfaction with the return on the Fund's investments, the trustees decided in late 1973 to seek a new investment manager. David Sack, the administrator of the Fund, was responsible for presenting potential managers to the trustees. Sack invited a few companies to two trustees' meetings, where they presented their proposals for investment of the Fund's assets. At the second of these meetings, David Friedland introduced A. Stone Douglass, who represented Unicorn Pension Management Associates, a relatively inexperienced investment firm. Friedland stated that Douglass was an "excellent" investment counselor who had received a "fantastic" rate of return on investments he had made. Trial Transcript at 1247. David Sack had never met Douglass, nor had he invited Unicorn to make a presentation to the trustees at any meeting.

Soon after this meeting was held, Sack was informed that Unicorn had been selected by the trustees as the new investment

manager. After Unicorn had served for some time as investment manager, A. Stone Douglass left Unicorn and formed his own firm, Douglass Embry Co. Shortly thereafter, the trustees transferred management of the Fund's investments from Unicorn to Douglass Embry Co.

In February 1975, the Friedlands were introduced to Barry Marlin, a California businessman, at a party given by Kate Edelman, a mutual friend. At that time, Marlin was seeking financing for one of his business ventures, Dunhill Brown Corp. To obtain financing, Marlin had arranged for a public offering of $3.5 million in Dunhill Brown debentures. When Marlin mentioned the upcoming public offering to David Friedland, Friedland replied, "I have a client that could do a loan like that if you are interested." Trial Transcript at 174.

Marlin initially declined Friedland's offer, but later arranged to meet with him in Kate Edelman's New York apartment in February or March of 1975 to discuss the loan. Marlin requested a $3.5 million loan for a term of four or five years at ten percent interest; Friedland would agree only to a term of one or two years at twelve percent interest. David Friedland then disclosed that the source of the loan was a pension fund for which he served as general counsel, and he stated that he would require a ten percent kickback. Marlin agreed to pay a nine percent kickback ($315,000). Friedland insisted that Marlin pay the kickback in cash, in $100 bills, and that the money be withdrawn from sources outside the United States banking system. Marlin stated that he would use a bank under his control, the First Kensington Bank of the Cayman Islands.

Shortly thereafter, Marlin met with both David and his father, Jacob Friedland. After reviewing the terms of the loan, Jacob Friedland informed Marlin that the loan could be renewed every two years in exchange for an additional nine percent kickback. Jacob Friedland emphasized that the funds used to pay the kickback could not be taken from the loan proceeds, but would have to be drawn from sources outside the United States banking system.

After the meeting with representatives of Unicorn, Marlin expressed concern to David Friedland that Unicorn might not approve the loan to Dunhill Brown Corp. Friedland reassured Marlin, stating that "[i]f they don't give you the loan we'll take the fund away from them." Trial Transcript at 196.

In April 1975, David Friedland informed Marlin that the loan had been approved on the terms to which they had previously agreed. Friedland also told Marlin that the kickback would have to be paid on the same date as the closing, April 25, at a location outside the United States. Friedland suggested his condominium in Freeport, Bahamas, as a suitable site for payment of the kickback.

Marlin arranged to have his brother, Herbert, attend the closing of the loan in New York, on April 25, 1975. On the morning of April 25, Barry Marlin met David Friedland at Friedland's condominium in Freeport, Bahamas. After confirming that the loan proceeds had been paid, Marlin emptied his BOAC flight bag, containing the $315,000 kickback in one hundred dollar bills, onto the living room floor, where Friedland counted it.

In early May 1975, Marlin asked David Friedland whether the Fund could lend him an additional amount not greater than $1,000,000 so that he could open a business in New York; he added that the funds would not be needed until the end of the year. Friedland said that such a loan could be extended on the same terms as the first, provided that Marlin paid a nine percent kickback. Marlin did not actually request that the loan be made at this time.

In June 1975, David Friedland informed Marlin that in the future, instead of receiving a percentage of all loans arranged, he and his father wanted fifty percent of the profits of any business to which a loan was granted. David Friedland then gave Marlin what Friedland termed "information" Marlin "might need for the future." Trial Transcript at 263. Friedland revealed that he and his father had an account in the

Banque de L'Indochine et de Suez, in Lausanne, Switzerland, under the code name Stephen Sagleo.[4] Friedland also gave Marlin the name, address, and phone number of the Friedlands' Swiss banker, Alain Peytral.

In the following months, Marlin attempted to obtain loans from the Fund for several business ventures. None of these loans was finalized. During this same period, Marlin was also seeking depositors for his First Kensington Bank, in order to improve its balance sheet.

On July 16, 1975, David and Jacob Friedland, who had complained of the low rate of interest paid by their Swiss bank, transferred $1,050,000 of their personal funds to the First Kensington Bank's accounts at two London banks. The First Kensington Bank used these funds to purchase certificates of deposit paying 8.5 percent interest, and then endorsed the certificates back to the Friedlands' Swiss bank, the Banque de L'Indochine et de Suez. This transaction apparently allowed the First Kensington Bank to carry the certificates on its balance sheet, and allowed the Friedlands to earn higher interest on their funds while retaining the security afforded by a Swiss bank. The Friedlands' personal funds remained on deposit at the London banks until March 19, 1976, and earned in excess of $60,000 in interest.

David Friedland's federal income tax return for 1975 listed adjusted gross income of $26,692 and interest income of $21. His 1976 form listed adjusted gross income of $28,134 and interest income of $0. Jacob Friedland's 1975 federal income tax return listed adjusted gross income of $42,124 and interest income of $13. His return for 1976 listed adjusted gross income of $30,623 and interest income of $14.

In October 1975, Marlin requested a loan for his new business in New York, according to the terms he had discussed with David Friedland in May 1975. Marlin said that he would need $500,000. The Friedlands agreed that the loan would be granted in December, in exchange for a kickback

of nine percent, or $45,000. In December, Marlin gave David Friedland the $45,000 in cash on the same day the loan was scheduled to close.

In January 1976, Marlin's financial empire began to collapse, and he discovered that he was under investigation by the Securities Exchange Commission. At about this time, David Friedland told Kate Edelman about the kickbacks that had been received from Marlin, and expressed fear that Marlin might report the kickbacks to the authorities.

In May 1977, Marlin was indicted in California for fraudulent business practices. In July 1977, he was indicted on similar charges in Illinois. He pleaded guilty in both jurisdictions, and was sentenced to five years imprisonment in Illinois, and to a concurrent ten year term in California. In early May 1979, Marlin began cooperating with the government and revealing the details of his kickbacks to the Friedlands.

On July 4, 1979, the Friedlands met with Kate Edelman and told her that Marlin had "talked." They outlined exactly what they wanted her to tell the authorities when she was contacted. In reference to the first loan and kickback, they asked her to say that she had seen a suitcase with $750,000 cash in it, part of which Marlin was planning to take to his bank in the Cayman Islands, and part of which Marlin intended to use to buy a condominium in the Bahamas. The Friedlands offered to pay any legal expenses Edelman incurred, and discussed the possibility of obtaining transcripts of any grand jury hearings to enable Edelman to "take the onus" off Marlin resulting from any incriminating testimony given by others. Edelman was contacted by the FBI later the same day, and was served with a grand jury subpoena on the following day.

### PROCEDURAL HISTORY

In October 1979, the Grand Jury for the District of New Jersey returned a multi-

---

4. The name "Sagleo," according to testimony, was arrived at by combining David Friedland's astrological sign, "Sagittarius," with his wife's sign, "Leo." Trial Transcript at 264.

count indictment charging appellants David Friedland and Jacob Friedland with one count of conspiracy to solicit and receive kickbacks, 18 U.S.C. § 371 (1976); two counts of soliciting and receiving kickbacks, 18 U.S.C. § 1954 (1976); one count of traveling and causing to travel with intent to promote and facilitate bribery, 18 U.S.C. § 1952 (1976); and one count of endeavoring to obstruct justice, 18 U.S.C. § 1503 (1976). In January 1980, the grand jury returned a superseding indictment which, in addition to the charges listed above, charged each appellant with two counts of making false income tax returns, 26 U.S.C. § 7206(1) (1976).

Before trial, the appellants moved to dismiss Counts 2, 3, 4 and 5 of the indictment, on the ground that, by failing to allege any duty, decision, or action on their part as the basis for the payment of the kickback, Counts 2, 3 and 4 failed to charge an essential element of the crimes. The appellants also argued that the charges in these counts, particularly the obstruction of justice charge in Count 5, were not specific enough to be met, or to prevent double jeopardy in future prosecutions. The appellants also moved pursuant to Fed.R.Crim.P. 14 to sever the income tax fraud counts from the remainder of the indictment, in order to prevent prejudice from joinder. The trial court denied these motions.

Following trial, the jury returned a verdict of guilty against both Jacob and David Friedland on all counts. The appellants filed a motion for a judgment of acquittal on all counts, pursuant to Fed.R.Crim.P. 29(c), and in the alternative, for a new trial pursuant to Fed.R.Crim.P. 33. The trial court denied appellants' motions.

## DISCUSSION

*Scope of 18 U.S.C. § 1954*

Appellants were convicted under 18 U.S.C. § 1954, which provides in pertinent part:

Whoever being ... counsel ... of any employee welfare benefit plan or employee pension benefit plan receives or agrees to receive or solicits any fee, kickback, commission, gift, loan, money, or thing of value because of or with intent to be influenced with respect to, any of his actions, decisions, or other duties relating to any question or matter concerning such plan ... shall be fined not more than $10,000 or imprisoned not more than three years, or both ....

The trial court, in his instructions to the jury, recognized that there are two prongs to § 1954: one may be convicted for receiving a kickback (a) "because of" or (b) "with intent to be influenced with respect to" any actions, decisions, or other duties relating to the plan involved.

Appellants contend that the trial court erred in failing to instruct the jury that it must find that appellants had some capacity to influence the granting of the loan. Appellants cite this court's decision in *United States v. Palmeri*, 630 F.2d 192 (3d Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981), in support of this proposition. They contend that *Palmeri* requires a finding that appellants had a demonstrated capacity to control or influence the issuance of loans. In so doing, appellants read too much into the *Palmeri* decision. In *Palmeri*, this court held that one could be among the class of persons whose actions are proscribed by § 1954 even though one has no fiduciary relationship to the employee benefit plan. 630 F.2d at 199–200. The central issue in that case was whether one must have a capacity *directly* to influence the employee plan in order to violate § 1954. *Palmeri* clearly stands for the proposition that capacity to influence *indirectly* is sufficient to support conviction under § 1954.[5] The jury in the instant case found that appellants

---

5. The *Palmeri* court stated: "The more reasonable construction of [§ 1954] is one that includes within the regulated class all persons who exercise control, direct or indirect, authorized or unauthorized, over the fund." 630 F.2d at 199.

were counsel to the Fund.[6] Appellants' status as counsel to the Fund is sufficient to place them in the class of those persons capable of violating either prong of § 1954 simply by soliciting or accepting payment (a) by virtue of their status as counsel, under the "because of" prong, or (b) with an improper purpose, under the "intent" prong. Therefore, the failure to instruct the jury to make a specific finding of "capacity" was not error.

Appellants further contend that the trial court erred in its instructions regarding the "because of" prong, and, because the jury's guilty verdict may have rested on either prong, the verdict must be overturned. *See United States v. Dansker*, 537 F.2d 40, 51 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Appellants claim that the trial court erred in · charging the jury:

> Furthermore, you need not find the defendants actually influenced the granting of the loans to find they received the cash payments because of his [*sic*] actions, decisions, and duties relating to the loans, so long as such influence was the stated purpose in receiving the cash payments.

Appendix at 353. Appellants argue that, in order to come under the "because of" prong, they must be shown to have actually taken some action in return for the kickback.

This court confronted a similar argument in *United States v. Niederberger*, 580 F.2d 63 (3d Cir.), *cert. denied*, 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978). Niederberger was charged with receiving an illegal gratuity in violation of 18 U.S.C. § 201(g), which provides:

> Whoever, being a public official, former public official, or person selected to be a public official, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself for or *because of* any official act performed or to be

performed by him . . . shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

(Emphasis supplied.) We rejected Niederberger's claim that the indictment must allege some quid pro quo for the gift received. Noting that § 201(c)(1) substitutes the phrase "in return for" for "because of," we stated:

> It is clear, then, that § 201(c)(1) requires as one of its elements a quid pro quo. In fact, we find this to be the primary distinction between subsections (c)(1) and (g). . . .
>
> Thus, we find it unnecessary for the Government to allege in an indictment charging a § 201(g) offense that a gratuity received by a public official was, in any way, generated by some specific, identifiable act performed or to be performed by the official. A quid pro quo is simply foreign to the elements of a subsection (g) offense. What is proscribed, simply put, is a public official's receipt of a gratuity, to which he was not legally entitled, given to him in the course of his everyday duties, for or because of any official act performed or to be performed by such public official, and he was in a position to use his authority in a manner which could affect the gift-giver.

580 F.2d at 68–69.

■ We find this analysis equally applicable when it is counsel to a pension fund, and not public officials, who receive what the *Niederberger* court called an "illegal gratuity." *Id.* We believe the trial court was correct in not requiring that any action actually be taken in order for the jury to find that the kickback was received "because of" actions, decisions, or other duties relating to the Fund. So long as appellants were counsel to the Fund, and received the kickback (a) because of that status, which gave them at least ostensible power to exercise influence, or (b) with the purpose of exercising the influence they either actually or ostensibly had over decisions regarding the Fund, then they need not be shown to

---

**6.** The trial court instructed the jury that it must find that appellants were counsel to the Fund in order to render a guilty verdict under Count

3 of the indictment. Appendix at 351. Appellants were found guilty under Count 3.

have actually exercised such influence. If actual exercise of influence were a prerequisite to a violation, then anyone who could potentially influence a future decision concerning a pension plan would be free to solicit kickbacks so long as he ultimately took no action to influence the decision. Such a construction is inconsistent with the broad purpose of § 1954. *See United States v. Palmeri*, 630 F.2d 192, 199–200 (3d Cir. 1980), *cert. denied*, 450 U.S. 967, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981).

When counsel to an employee pension fund take a kickback for the stated purpose of exercising their influence over the fund, then their actions come within the "because of" prong of § 1954.

*Denial of the Evidentiary Hearing*

■ Appellants contend that the trial court erred in denying their motion for an evidentiary hearing to determine whether the government lost or destroyed certain discoverable evidence. The evidence in question falls into two categories: (1) Barry Marlin's personal financial records; and (2) the records of the First Kensington Bank of the Cayman Islands.

This court has held that "[l]oss or destruction of relevant evidence by the government not only raises general questions of the fundamental fairness of a criminal trial, but may also deny a defendant the right to compulsory process." *Virgin Islands v. Testamark*, 570 F.2d 1162, 1166 (3d Cir. 1978). The court below, however, found that the appellants' motion for an evidentiary hearing was unsupported by any showing that the records in question ever existed, or, if they did, that they were relevant to the instant case. The only support for the appellants' motion with respect to Marlin's personal records is the bare inference that appellants would draw from the presence of empty, labeled file folders, coupled with Marlin's alleged "mania" for record-keeping. Appellants presented no evidence tending to show that the file folders were not empty when the government gained possession of them. Furthermore, the trial court, in its opinion in support of its denial of the motion, noted that the allegations of loss or destruction of this evidence "are little more than suppositions and specula-

tion based entirely on hearsay statements by unidentified third parties and individuals having no personal knowledge of the alleged destruction of evidence. Significantly, no affidavits have been filed by any of these individuals to support defendants' allegations." Appendix at 105–06 (citations omitted) (footnote omitted).

Because appellants failed to make any showing that the evidence sought ever existed or was relevant to the instant proceeding, the trial court did not err in denying the motion for an evidentiary hearing.

*Presence of Improper or Prejudicial Evidence or Statements Before the Jury; the Jury's Consideration of Appellants' Failure to Testify*

■ Appellants seek review of several rulings of the trial court regarding the consideration of certain evidence or statements by the jury. Their first contention is based on a published newspaper interview with a juror. The interview, which took place after the verdict was announced, indicated that the jury had improperly considered and discussed the appellants' failure to testify.

The trial court refused to conduct an examination of the jurors to verify the appellants' claim. As the court found, any inquiry into the jury's deliberations would necessarily have violated Fed.R.Evid. 606(b), which provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about what he would be precluded from testifying be received for these purposes.

The inquiry requested by appellants falls squarely within the prohibition of Rule 606(b). Because "extraneous prejudicial information" or "outside influence" were not alleged by appellants, the inquiry would not have fallen within the exceptions to the rule. *See United States v. D'Angelo*, 598 F.2d 1002, 1004–05 (5th Cir. 1979). Therefore, the trial court's refusal to conduct the inquiry will be upheld.[7]

Appellants further argue that their convictions must be reversed because documents not admitted into evidence were sent to the jury room. The record reveals that the exhibits in question—G77A and C—had been formally and properly admitted without objection.[8] These exhibits included certain financial records of the appellants.

Subsequent to admission of these exhibits, the trial court made a ruling excluding certain categories of evidence; the exhibits in question apparently fell into one of the excluded categories. However, no mention was made of exhibits G77A and C at the time of this ruling, and neither the Government nor the defense moved to withdraw them from the jury's consideration. Furthermore, although counsel were afforded ample opportunity to examine all evidence before it was finally submitted to the jury, no objections were made to the submission of these exhibits.[9]

Under Fed.R.Crim.P. 51, a party is ordinarily barred from asserting error unless the party "makes known to the court the action which he desires the court to take or his objection to the action of the court and the grounds therefor . . . ." If the exhibits were not intended by the court or the parties to remain in evidence, or were not actually admitted into evidence, appellants cannot now object to their presence in the jury room unless they can show that the court committed "plain error." Fed.R. Crim.P. 52(b).

When exhibits not in evidence reach the jury, a new trial should not be ordered unless it is shown that the evidence was so prejudicial that the defendant was denied a fair trial. *United States v. Camporeale*, 515 F.2d 184, 188 (2d Cir. 1975); see also *United States v. Stoehr*, 196 F.2d 276, 283 (3d Cir.), *cert. denied, Stoehr v. U. S.*, 344 U.S. 826, 73 S.Ct. 28, 97 L.Ed. 643 (1952). The expenditures revealed in exhibits G77A and C were inconsequential when compared with those revealed in the remainder of the evidence. We cannot say that the trial court committed "plain error" in finding that the presence of exhibits G77A and C in the jury room did not prejudice the appellants.

Appellants also contend that evidence showing that they had a secret Swiss bank account should not have been admitted. Appellants concede that this evidence was relevant to the tax fraud counts in the indictment; however, they argued at trial for severance of these counts because of the prejudicial effect this evidence might have with respect to the remainder of the counts.

The trial court denied appellants' motion for severance of the tax fraud counts. It did so because it accepted the Government's argument that the Swiss bank account evidence was relevant to the conspiracy count, Count 1. The Government contended that the appellants had discussed the bank account with Barry Marlin as part of a plan

7. *United States v. Vento*, 533 F.2d 838 (3d Cir. 1976), cited by appellants, is inapposite. An inquiry was conducted in that case for the limited purpose of discovering whether, in fact, extraneous prejudicial information was improperly brought to the jury's attention. 533 F.2d at 869–70.

8. In fact, when the Government sought to continue questioning the custodian of these records, counsel for appellant Jacob Friedland stated: "Your Honor, we object. They're now in evidence. The jury can have them. They speak for themselves." Trial Transcript at 1865–66. The record also shows that the clerk announced the receipt of the exhibits in evidence. *Id.* at 1865.

9. In the instant case, the defense counsel were given the opportunity to examine the exhibits before the exhibits were sent to the jury room. In general, the defendant should not be allowed to speculate by letting error go unremarked while then seeking a new trial on the basis of an unfavorable verdict. 3 Wright, *Federal Practice and Procedure* (Criminal) § 842, at 342 (1969).

for the distribution of proceeds during future loans to be made from the pension fund. The Government further contended that the revelation of the secret account tended to show a close relationship between appellants and Marlin which supported the conspiracy charge.

Under Fed.R.Evid. 401, evidence concerning the appellants' disclosure of the existence of their secret Swiss bank account to Marlin was relevant to prove the conspiracy charged in Count 1. Rule 401 provides:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Marlin's familiarity with the secret account supports his testimony that appellants had discussed with him their plan to use the account to effectuate future schemes involving pension plan funds. It also tends to show, as the Government contended it would, a close association between appellants and Marlin which supports the conspiracy conviction.

■ Because the evidence concerning the Swiss account was relevant, the only remaining question is whether the evidence should have been excluded under Fed.R. Evid. 403, on the ground that "its probative value [was] substantially outweighed by the danger of unfair prejudice . . . ." The trial court's ruling that exclusion was not warranted should be affirmed unless it was arbitrary or irrational. *United States v. Long*, 574 F.2d 761, 767 (3d Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978). The record shows that the trial court carefully considered whether the evidence was sufficiently prejudicial to justify its exclusion, and that the court concluded that it was not. The court's finding was certainly not arbitrary or irrational, and therefore it must be upheld.

■ Finally, appellants contend that certain remarks made by the Government in its opening were so prejudicial as to require reversal. The Government made reference to appellants' "fleecing" of the pension fund, to appellants' "extravagant lifestyle," and to appellants' duty to protect the fund.

Even if these remarks are construed as inaccurate or improper, reversal is appropriate only when defendants are prejudiced by the alleged improprieties. *United States v. Somers*, 496 F.2d 723, 737 (3d Cir.), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). The trial judge is in the best position to weigh the significance of challenged statements in the context of the entire case, to assess the impact of the statements upon the jury, and to determine what remedy, if any, is appropriate. The trial court should be given broad discretion to control the opening remarks. *Cf. Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975) (trial court given broad discretion to control closing remarks); *Draper v. Airco, Inc.*, 580 F.2d 91, 94 (3d Cir. 1978) (same). The trial court carefully supervised all phases of the trial, including the opening; we cannot say that he abused his discretion in finding these remarks unprejudicial.

*Count 5: The Obstruction of Justice Charge*

■ Count 5 of the indictment charged appellants with violating 18 U.S.C. § 1503, which provides in relevant part:

> Whoever . . . corruptly or by threats of force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

Count 5 charged that appellants

> did corruptly endeavor to influence, obstruct and impede the due administration of justice in that the defendants endeavored to cause Kate Edelman to render false and misleading testimony before a duly empanelled United States Grand Jury . . . .

Appendix at 34. Appellants urge reversal of their conviction under Count 5 on two grounds: (1) the indictment does not meet this circuit's specificity requirements in false statements cases, and (2) Kate Edelman was not a "witness" within the meaning of § 1503.

In support of their first contention, appellants cite this court's decisions in *United States v. Slawik*, 548 F.2d 75 (3d Cir. 1977), and *United States v. Tonelli*, 577 F.2d 194 (3d Cir. 1978). Each of these cases involved a challenge to an indictment under 18 U.S.C. § 1623, which provides in part:

> Whoever under oath ... in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration ... shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Because materiality and falsity are expressly included as elements of an offense under § 1623, this court imposed a requirement of specificity in the indictment:

> We find the same prosecutorial deficiency which undermined the *Slawik* conviction—the failure to specifically allege in the indictment the precise falsehoods charged—exists here.

*Tonelli*, 577 F.2d at 196.

Appellants contend that the same specificity requirement should be imposed on an indictment under 18 U.S.C. § 1503. We cannot agree. Although the method employed by appellants in violating § 1503 consisted of an attempt "to cause Kate Edelman to render false and misleading testimony," this case is not thereby transformed into a "false statements case," as appellants contend. Rather, it is an obstruction of justice case. Materiality and falsity are *not* elements of the crime charged here.

We conclude that an indictment under § 1503 for endeavoring to obstruct justice, which is based upon an attempt to induce the rendering of false testimony, need not satisfy the specificity requirements imposed by *Slawik* and *Tonelli* for a § 1623 violation.[10]

■ Appellants' second contention is that Kate Edelman was not a "witness" within the meaning of § 1503. While this may be true, it is entirely irrelevant. Appellants were charged and convicted under a portion of § 1503 which, unlike the other provisions of § 1503, does not include any reference to a "witness." Rejecting a claim identical to that advanced by appellants, the court in *Falk v. United States*, 370 F.2d 472 (9th Cir. 1966), *cert. denied*, 387 U.S. 926, 87 S.Ct. 2044, 18 L.Ed.2d 982 (1967), stated:

> [T]he defendant ... was not charged with influencing a 'witness' within the first provision of Section 1503. [He] was charged with endeavoring to influence, obstruct or impede the due administration of justice. The means of so doing was by attempting to corruptly influence prospective witnesses. It is clear that in

---

**10.** Appellants also make what is essentially a variance claim. They note that, in response to an order of the trial court, the Government supplied the following as the false statements which appellants encouraged Kate Edelman to make:

> She saw a suitcase with $750,000 in it which Barry Marlin was taking to his bank in the Cayman Islands; whatever was left of the money after Marlin made a deposit, he was taking to the Bahamas to buy an apartment close to David Friedland's apartment.

Appendix at 192. At trial, the court found the evidence insufficient to sustain a § 1503 conviction except as to the allegation that appellants solicited the statement regarding Marlin's stated intent to buy an apartment close to David Friedland's. Thus, appellants argue, they may have been *convicted* for soliciting the statement regarding the apartment, while having been *indicted* by the grand jury for soliciting the other statements supplied by the Government.

We need not determine whether this constitutes variance to conclude that it is not, in any event, fatal variance:

> The federal courts have scrapped the old rule condemning every variance between indictment and proof, and convictions are not now set aside except for variance resulting in substantial prejudice to defendant.

*Jackson v. United States*, 359 F.2d 260, 263 (D.C.Cir.), *cert. denied*, 385 U.S. 877, 87 S.Ct. 157, 17 L.Ed.2d 104 (1966). In the instant case we can discern *no* prejudice to appellants resulting from the events they allege as variance. As explained in the text, the indictment was sufficient on its face to charge a violation of § 1503. The Government, by subsequently supplying the false statements upon which the indictment was based, placed appellants on notice as to what charges they would have to defend themselves against. *See United States v. Izzi*, 613 F.2d 1205, 1210–11 (1st Cir.), *cert. denied*, *Santos v. U. S.*, 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 793 (1980).

the mind of the defendant, they were prospective witnesses. If he had thought otherwise, there would have been no reason to ask [them] to testify falsely. So, while the term 'witness' may be a word of art in an indictment under the first portion of Section 1503, the phrase 'prospective witnesses' is descriptive only of the intended status of [those whom the defendant attempted to influence] when the Indictment charges obstruction of justice.

370 F.2d at 476. We agree with the *Falk* court in concluding that solicitation of false testimony from a prospective witness may provide the basis for a conviction under the obstruction of justice provision of § 1503. In the instant case, Kate Edelman was unquestionably a prospective witness in the minds of defendants when they asked her to testify falsely.[11] As a result, their conduct fell squarely within that portion of 18 U.S.C. § 1503 under which they were charged.[12]

## The Motion For A New Trial

After the jury verdict, appellants moved for a new trial under Fed.R.Crim.P. 33, which provides in relevant part:

> The court on motion of a defendant may grant a new trial to him if required in the interest of justice.

Appellants contend that the verdict against them is unjust because it rests upon the testimony of Barry Marlin. Because appellants believe Marlin's testimony was not credible, they contend that the trial court should have granted a new trial "in the interest of justice."

The denial of the motion for a new trial will be upheld so long as the trial court did not abuse its discretion or fail to exercise it. *United States v. Iannelli*, 528 F.2d 1290, 1292 (3d Cir. 1976). The record reveals that the trial court carefully considered the evidence in the case before reaching its conclusion. The trial court expressly recognized its power to consider the credibility of Government witnesses, specifically Marlin. Appendix at 572–75. Nevertheless, the court found Marlin sufficiently competent to allow the jury to decide whether or not he should be believed.[13] We cannot say that it was an abuse of discretion to defer to the jury in this case, in which ample evidence on the issue of Marlin's credibility was placed before the jury.[14]

Moreover, the record reveals that the trial court did not end its inquiry after accepting the jury's determination of Marlin's credibility. The court found significant corroborating evidence on the record.[15] In sum, the court carefully satisfied itself that,

11. When appellants suggested that Edelman make the statements involved, she stated that she had not been contacted by the authorities. Appellants responded: "But you will." Trial Transcript at 1929.

12. Because we find that Edelman was a prospective witness under *Falk*, we need not confront the question whether appellants could have been convicted under the obstruction of justice provision were Edelman *not* a prospective witness.

13. In denying the motion for a new trial, the trial court stated: "Criminal cases, and this one is no exception, usually are fought on the battlefield of credibility.... A witness such as Marlin is not incompetent to be a witness." Appendix at 574.

14. Responding to a credibility challenge similar to that of appellants, the Supreme Court, in *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), stated: "The short answer to this is that the credibility of a wit-

ness is a question for the jury." *Id.* at 77, 62 S.Ct. at 468.

15. In support of its denial of appellants' motion for a new trial, the trial court stated:

> ... I must part company with the defendants when they claim that Marlin is not corroborated.... He was corroborated principally by the testimony of Kate Edelman, Fred Otash and Max Cohen. There is also significant corroboration contained in the great mass of documentary evidence introduced.
>
>       \*     \*     \*
>
> In short, although I recognize that there can be most legitimate question concerning Marlin's credibility, those questions were fully explored and presented issues for the jury. I cannot say on the record of this case that a miscarriage of justice occurred and I do not believe that judicial interference with the verdicts is warranted.

Appendix at 575–76.

given the evidence in the record, including the credibility of witnesses, an injustice had not been committed as a result of the jury's verdict. We conclude that the trial court did not abuse its discretion in denying the motion for a new trial.

*Barry Marlin's Credibility*

■ Appellants grounded their attack in this appeal upon Marlin's lack of credibility. Appellants' briefs commence with an "Introductory Statement," quoting at length the trial court's characterization of Marlin as, among other things, a "gargantuan thief."[16] The briefs are replete with quotations in which the trial court expressed its opinion that Marlin was an unsavory character who was not believable. Apparently, the appellants would have us overturn the verdict based upon our reading of the trial court's assessment of Marlin's credibility, despite the trial court's finding that Marlin was a competent witness.[17] This we cannot do.

The issue of Marlin's credibility was amply tested at trial. Both judge and jury heard and saw Barry Marlin testify at great length. Marlin was subjected to vigorous cross-examination by experienced counsel. Marlin's testimony on cross-examination alone occupies over 700 pages in the record. Nevertheless, although the jury could have refused to believe Marlin's testimony, it obviously decided not to do so. And, although the trial court could have granted appellants' motion for a new trial, after a consideration of the credibility issue it decided not to do so. In this appeal, the main thrust of appellants' argument is directed against Marlin's testimony. Appellants would have us make a credibility judgment different from that made by the trial court and jury. We decline.

The judgment of the district court will be affirmed.

ADAMS, Circuit Judge, concurring.

This case presents several troubling aspects. Much of the evidence in support of the convictions here consists of testimony by Barry Marlin, a witness who the district court indicated was unworthy of belief. Prejudicial testimony regarding the existence of a Swiss bank account in the name of the Friedlands was heard by the jury despite the government's ultimate failure to connect the Swiss bank account to the transactions in question, although such connection was promised by the prosecution at the time the evidence was introduced. Either of these matters might properly have been a basis for a district court decision to grant defendants' motion for a new trial. Furthermore, there appears to be a serious question whether a hearing should have been conducted to determine if some of the documentary evidence had been tampered with in an impermissible manner. Nevertheless, the record is insufficient to support the contention that the district court's refusal to hold a hearing on the possible destruction of evidence or to grant a motion for a new trial was either an abuse of discretion or legal error. Accordingly, I concur in the result reached by the majority.

---

16. Brief for Jacob Friedland at 4; incorporated by reference in Brief for David Friedland at 2.

17. *See* note 13 *supra.*