**UNITED STATES of America**

v.

**Joseph M. ROBERTO.**

**Crim. No. 5:91CR00009.**

United States District Court,
D. Connecticut.

Feb. 3, 1992.

Robert J. Devlin, Jr., Asst. U.S. Atty., New Haven, Conn., for plaintiff.

Andrew Bowman, Westport, Conn., for defendant.

## RULING ON DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL

ELLEN B. BURNS, Chief Judge.

After a three-day jury trial and pursuant to Fed.R.Crim.P. 29(b)–(c), the Defendant, Joseph M. Roberto, has moved for a judgment of acquittal following his conviction on a one-count indictment of receiving or soliciting a gift or thing of value because of any of his actions, decisions, or other duties as a Trustee of the International Brotherhood of Teamsters Local 191 Health Services and Insurance Plan. In addition to returning a verdict of guilty, the jury specifically found on the Special Verdict and Interrogatory Form that Roberto received carpentry, plumbing, and electrical work in violation of 18 U.S.C. § 1954.

Roberto contends that his conviction under 18 U.S.C. § 1954 should be overturned because there was insufficient evidence to support the jury's verdict on every essential element of the statute. Specifically, the Defendant claims that *United States v. Palmeri*, 630 F.2d 192 (3rd Cir.1980), *cert. denied*, 450 U.S. 967, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981), requires the relief requested because the Government failed to prove that the gift or thing of value was received "because of" his duties as a plan Trustee. Roberto contends that, since there was no direct evidence offered as to communications between himself and the electrical contractor, Stavola Manson Electric Co., Inc., regarding the work performed in the basement of his Trumbull, Connecticut home, the "because of" element of section 1954 was not satisfied. (Def.'s Mem.Supp.Mot.J. Acquittal at 3–4). Roberto claims the same flaw with the plumbing work performed by employees of A & M Piping Contractors Inc. (*Id.* at 4–5). Finally, Roberto claims that the testimony regarding the friendship between himself and the plumbing and carpentry (Bismark Construction Co., Inc.) contractors dispels the notion that the work performed in the basement of his home was provided "because of" his duties as a Trustee of the Local 191 Health Services and Insurance Plan. (*Id.* at 5). The Court disagrees, and, for the reasons that follow, the Defendant's motion is denied.

## DISCUSSION

The standard in this circuit for granting a motion for judgment of acquittal is settled. *See United States v. Fiore*, 821 F.2d 127, 128 (2d Cir.1987). In evaluating such a motion,

[t]he evidence must be viewed in the light most favorable to the verdict; all inferences must be drawn in the [G]overnment's favor; the [D]efendant bears a heavy burden; the verdict must be sustained if there is substantial evidence to

support it; and ... the conviction must be sustained if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* (citing, *inter alia, Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)); *see also United States v. Bryser,* 954 F.2d 79, (2d Cir.1992); *United States v. Brown,* 937 F.2d 32, 35 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 323, 116 L.Ed.2d 264 (1991); *United States v. Macklin,* 927 F.2d 1272, 1277 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 146, 116 L.Ed.2d 112 (1991); *United States v. Buck,* 804 F.2d 239, 242 (2d Cir.1986); *United States v. Artuso,* 618 F.2d 192, 195 (2d Cir.), *cert. denied,* 449 U.S. 861, 101 S.Ct. 164, 66 L.Ed.2d 77 (1980). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to the ultimate facts." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Viewing the evidence most favorably to the Government and crediting every inference in its favor, the Court finds that the evidence was sufficient to support the jury's verdict convicting Roberto under 18 U.S.C. § 1954.

Section 1954 prohibits, *inter alios,* a trustee of any employee welfare benefit plan from receiving, agreeing to receive, or soliciting "any ... gift ... or thing of value because of ... any of his actions, decisions, or other duties relating to any question or matter concerning such plan." 18 U.S.C. § 1954. This proscription extends to "all persons who exercise control, direct or indirect, authorized or unauthorized, over the fund." *United States v. Palmeri,* 630 F.2d 192, 199 (3rd Cir.1980), *cert. denied,* 450 U.S. 967, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981); *accord United States v. Robilotto,* 828 F.2d 940, 946 (2d Cir.1987), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 662 (1988).

Undisputed evidence demonstrated that Roberto, at the relevant times, was a Trustee of the Local 191 Health Services and Insurance Plan, which is an employee welfare benefit plan within the purview of section 1954. Furthermore, undisputed evidence demonstrated that Roberto personally received in part, and solicited and received in part, a gift or thing of value from contractors doing substantial business with the employee welfare benefit plan, that is, carpentry, plumbing, and electrical labor and materials used to remodel the basement of his Trumbull, Connecticut home. Roberto contends, however, that the Government failed to proffer sufficient evidence so that a reasonable jury could fairly conclude beyond a reasonable doubt that he received the remodeling work and materials "because of ... any of his actions, decisions, or other duties relating to any question or matter concerning" the employee welfare benefit plan. 18 U.S.C. § 1954. The Court disagrees.

The statute itself, within the context of its legislative history, reveals that Congress sought to outlaw not only kickbacks but also other conflict-of-interest payments to assure that the financial integrity of the plans administered would not be jeopardized by breaches of trust. *United States v. Romano,* 684 F.2d 1057, 1064 (2d Cir.) ("Congress used very broad language to prohibit receipt of 'any fee, kickback, commission, gift, loan, money, or thing of value,' rather than just kickbacks."), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 375, 376, 74 L.Ed.2d 509 (1982). Hence, the statute was intended in part "to ensure that anticipated benefits would be available when needed." *United States v. Soures,* 736 F.2d 87, 89 (3rd Cir.1984) (citing H.R.Rep. No. 998, 87th Cong., 1st Sess. 7, *reprinted in* 1962 U.S.C.C.A.N. 1532, 1535), *cert. denied,* 469 U.S. 1161, 105 S.Ct. 914, 83 L.Ed.2d 927 (1985).

Specifically, section 1954 prohibits the receipt of any gift or thing of value not only "with intent to be influenced" but also "because of" any action, decision, or other duty concerning the employee welfare benefit plan. Thus, "the broad language used in the statute reflects Congress's [sic] intent to reach all fiduciaries who profit (other than by their regular compensation) as the result of their" actions, decisions, or other duties relating to any question or

matter concerning the plan. *United States v. Romano*, 684 F.2d at 1064 (footnote omitted).[1]

Under the "because of" prong of section 1954, the jury is not required to find that any specific action or decision was actually taken in order to find the Defendant guilty. *United States v. Friedland*, 660 F.2d 919, 926 (3rd Cir.1981), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2268, 73 L.Ed.2d 1283 (1982).[2] Nor is the Government required to prove that the Defendant received a gift or thing of value in order to influence his acts or decisions. *United States v. Pieper*, 854 F.2d 1020, 1025 (7th Cir.1988). Rather, the Government needs only to establish that the Defendant received the gift or thing of value " 'because of' his status, which gave him at least ostensible authority to exercise influence over the" employee welfare benefit plan's decisions. *Id.; United States v. Friedland*, 660 F.2d at 926–27. A violation of section 1954 does not, however, flow solely from the status of the accused, and the jury was so instructed in this case.[3]

Based upon the following summary of the evidence, a rational jury could have found beyond a reasonable doubt that the Defendant received the gratuitous remodel-

ing work and materials because of his duties and authority as a plan Trustee.

As to the carpentry work, Roberto requested Joseph Murphy, a superintendent for Bismark Construction Co., Inc., to send some workers to his home in Trumbull, Connecticut for a basement renovation. At the time of the request, Murphy was working on a major construction project for the Local 191 Health Plan. Murphy knew Roberto as a Teamster official from the weekly project briefings, and Roberto's request was made on the site of the project. Murphy relayed the request to Gregory Raucci, the owner and President of Bismark Construction, who later directed Murphy and another employee of Bismark to Roberto's home for the renovation. Murphy testified that he never discussed payment for this work with anyone, including Raucci, and that Roberto never asked for a price quote for the carpentry services.[4] Moreover, Murphy stated that the normal business practice of Bismark Construction was to maintain detailed records for each job; yet, none of those records were kept for the work performed at Roberto's home.

Raucci had become acquainted with the Local 191 officials, including Roberto, because of the ongoing renovation of the Local's Health Plan building and annex and

1. "If only corrupt transactions were intended to be covered, Congress would not have added the 'because of' clause, but would have limited the statute to those possessing the intent to be influenced." *United States v. Romano*, 684 F.2d at 1064 (footnote omitted).

2. Requiring evidence of an act or decision to convict under the "because of" prong of the statute would "create a loophole in the statute by which illegal acts would become decriminalized through delegations and subterfuge. Such a result would fly in the face of Congress' clearly expressed legislative intent...." *United States v. Pieper*, 854 F.2d 1020, 1025 (7th Cir. 1988) (citing *United States v. Romano*, 684 F.2d 1057, 1064 (2d Cir.), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 375, 376, 74 L.Ed.2d 509 (1982)); *cf. United States v. Friedland*, 660 F.2d 919, 927 (3rd Cir.1981) ("If actual exercise of influence were a prerequisite to a violation, then anyone who could potentially influence a future decision concerning a pension plan would be free to solicit kickbacks so long as he ultimately took no action to influence the decision."), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2268, 73 L.Ed.2d 1283 (1982).

3. I instruct you that the Defendant's status alone as trustee of an employee benefit plan or an agent of an employee organization cannot provide the basis for the inference that his receipt of a gift or thing of value was because of his actions, decisions, or duties concerning the employee benefit plan. The Defendant has not violated this statute and the Government has not proven his guilt beyond a reasonable doubt if he received all of the remodeling work (which separately includes the construction, plumbing, and electrical work) only out of friendship or only because the contractors liked him. In other words, there must be a nexus, not a coincidence, between the Defendant's receipt of the thing of value and his duties as a plan trustee or union agent.
*United States v. Roberto*, No. 5:91CR00009 (EBB) (D.Conn. Nov. 19, 1991) (Jury Charge at 16).

4. Murphy also testified that he had an inclination that there was not going to be a charge for the work requested.

the weekly business meetings regarding the progress of the construction. Raucci testified that he knew Roberto was a union Trustee and that the value of the renovation of the Health Plan building and annex to Bismark Construction was approximately $1,900,000. According to Raucci, Roberto and Anthony Rossetti, another Local 191 Trustee, were the two people directly responsible for monitoring the progress of the construction.

Raucci testified that (i) Bismark never billed Roberto for the carpentry work performed in the basement of his home, (ii) Roberto never asked for a bill, and (iii) Bismark did not maintain any records (formal or informal) for the work performed in the basement of Roberto's home. From the beginning, Raucci never intended to bill Roberto for the work. Raucci further testified that the two employees of Bismark Construction who worked on the renovation of Roberto's basement received their regular salaries, which were billed to another account.

Raucci next gave varying testimony, which the jury could appropriately weigh, about the reason for providing the free work. Initially, Raucci stated that the work was provided out of friendship; later, he stated that the work was provided because of Roberto's status as a Trustee for the Local 191 Health Plan, which had provided his company with a significant amount of business. A reasonable jury was entitled to, and did in fact, reject Raucci's testimony that ascribed his friendship as the reason for providing the gratuitous work to Roberto.[5] Hence, a rational jury could have found beyond a reasonable doubt (on the basis of Raucci's testimony and the surrounding circumstances of the request for, and receipt of, free work) that the carpentry services were provided and received because of Roberto's duties and authority as a Trustee.[6]

As to the plumbing work and materials, Arthur Pivirotto, the Secretary–Treasurer of A & M Piping Contractors, Inc., testified that his company had provided approximately $250,000 worth of work to the Teamsters Local 191 Health Plan building and annex. Throughout this renovation, A & M Piping was working for r-conn., Inc., which was both the construction manager of the entire project and an affiliate of Bismark Construction Co., Inc. At this time, Pivirotto knew that Roberto was a Trustee and official of the Local 191 Health Services and Insurance Plan and that the Trustees of such plans generally made the decisions about awarding contracts and disbursing funds.

Pivirotto testified that A & M Piping sent two employees (with the necessary materials listed in Gov't Ex. 17) to complete the plumbing work associated with the renovation of Roberto's basement.[7] Pivirotto also said that he never billed Roberto for the work and that Roberto never asked for a bill.

Pivirotto next testified that the company provided the free work because of his long-standing friendship (for 8–10 years) with Roberto. As the Government's memorandum explains (Gov't Resp.Def.'s Mot.J. Acquittal at 6), the jury was entitled to reject this testimony. The friendship between Pivirotto and Roberto consisted principally of unplanned encounters in bars and restaurants and did not include what a reasonable jury could have considered normal incidents to a friendship (as opposed to an acquaintance), for example, personal visits, correspondence, or telephone calls. In-

---

5. On this issue, a reasonable jury could have appropriately considered Raucci's testimony that he did not have a personal relationship with Roberto, that Raucci first met Roberto at the Health Plan building renovation site, and that Raucci's only contact with Roberto was in connection with the work his company was doing for the Health Plan.

6. Although Raucci testified that no special favors were given or offered in return for the free

construction work, such evidence, as discussed *supra* at 949 & n. 2, is not necessary to convict under the "because of" prong of § 1954.

7. Although Pivirotto said that he did not personally dispatch the plumbers to Roberto's home, he authorized or ratified the free work. Pivirotto knew that the work was done, and he testified that he directed the plumbers to do the work because they would react to his demands.

deed, Pivirotto testified that he did not know where Roberto lived.

Pivirotto said that, in the past, he did favors for personal friends when they had a problem with their air conditioning, heating, or ventilating (e.g., an equipment malfunction or professional advice). This was rare, he said, because A & M Piping Contractors, Inc. did not normally do residential work. Pivirotto initially characterized the work performed at Roberto's home in the same manner. Pivirotto did, however, testify that he never provided to other personal friends gratuitous work of the same nature and to the same extent of that provided to Roberto, that is, constructing a bathroom from scratch and installing a sink in a bar for a remodeling project.

Finally, Pivirotto described the residential work his company did for another Local 191 Trustee, Anthony Rossetti, as both the nature of the business and a professional courtesy. The Government characterized Pivirotto's testimony about "the nature of the business" as a euphemism for graft (Gov't Resp.Def.'s Mot.J. Acquittal at 6), and a reasonable jury could agree with that characterization. Pivirotto stated that he did not have a personal friendship with Rossetti, but that the people in the professions extended this type of gratuity. The question whether the work performed at Roberto's home was also provided on this illegal basis was appropriately left for the jury's resolution.

This evidence, viewed as a whole, could lead a rational jury to conclude beyond a reasonable doubt that the plumbing work and materials were received by Roberto because of his status and authority as a Trustee of the Health Plan that provided A & M Piping with a significant amount of business.

As to the electrical work and materials, Dick Sears, a licensed electrician for Stavola Manson Electric Co., Inc., testified that Stavola Manson was the electrical contractor involved in the renovation of the Local 191 Health Plan building and annex. Sears first met Roberto when he did work on the basement of Roberto's Trumbull, Connecticut home.

Sears testified that his boss, Jay Stavola (one of the owners of Stavola Manson Electric), directed him to do the work at Roberto's home.[8] When Sears needed materials to perform the work necessary for the renovation, he called his office and spoke to Warren Pfaffenberger, the clerk responsible for ordering and delivering materials for the jobs. On occasion, Sears would complete his own material charge sheet for the Roberto job. Ordinarily, a number was assigned to each job, but Sears did not know what the number was for the Roberto work. Instead, when he called Pfaffenberger to order materials (or when he completed his own material charge sheet), he simply stated (or wrote) that he was at Joe Roberto's house. While working on the Roberto basement renovation, Sears was not working on the Moore Tool job (which is discussed *infra*), and he testified that he would have had no reason to order materials for the Moore Tool job when he was working on the Roberto job.

Warren Pfaffenberger testified about the standard procurement procedures of Stavola Manson Electric, and he particularly described the job number system used to control the delivery and billing of materials used at the site. Pfaffenberger stated that the number assigned for each job appeared on both the material charge sheet and the purchase order, along with the name of the particular job. The job number was used to ensure proper payment from the customer associated with the number. Once the supplies were received, Pfaffenberger kept the material charge sheet, the purchase order, and the receipt from the supply company together in one package.

Pfaffenberger next explained that the material charge sheets bore a notation that referred to Roberto's home, yet the job number assigned to each package of docu-

---

**8.** Sears guessed that the value of the work performed at Roberto's home was between $4,000– $5,000.

ments (including the purchase order) referred to another customer, Moore Tool. No job number was assigned to Roberto's home. When Pfaffenberger sent documents to the front office for billing purposes, he sent only a copy of the purchase order and the invoice. The material charge sheet, which bore the notation that referred to Roberto's home, was not included.[9]

Mr. Manson, the Office Manager and later Comptroller of Stavola Manson Electric, next testified. He stated that his responsibilities included monitoring the accounts receivable and accounts payable on a daily and weekly basis. To his knowledge, Stavola Manson never sent a bill for the renovation work, and Stavola Manson never received any money from Roberto. Manson stated that Stavola Manson seldom did residential electrical work.

When reviewing one of the purchase orders for material used at Roberto's home (which bore the Moore Tool job number), Manson stated that the number "seven" on the Moore Tool job number reflected, in Stavola Manson's course of business, that the materials used were purportedly for temporary work or lighting. The items listed on the purchase order, however, were not in his opinion the sort used for temporary lighting. In addition, Manson testified that the materials listed on the purchase orders would be added to the total cost of the Moore Tool job, though Stavola Manson would normally pay their suppliers monthly and recover that cost from the customer once the job was completed.

Finally, Manson stated that Roberto would visit the offices of Stavola Manson once or twice a month to see Stavola. Manson testified that the visits would normally last for thirty minutes; if the visit lasted longer, Stavola and Roberto would go elsewhere.

This evidence, viewed as a whole, could lead a rational jury to conclude beyond a reasonable doubt that the electrical work and materials were received by Roberto because of his duties and authority as a Trustee of the Health Plan that provided Stavola Manson with a significant amount of business. A reasonable jury could have found that the receipt of the free work was not a coincidence and that there was a nexus between Roberto's duties and authority as a Trustee and his receipt of the services. The evidence showed that Stavola and Roberto knew each other (and met regularly) and that Stavola had directed his electrician to do a substantial amount of work at Roberto's home, which was shown to be a gratuity.[10] In the context of the ongoing renovation of the Health Plan building and annex, a reasonable jury could have found the necessary nexus to convict under section 1954.

Also appropriate for jury consideration were the later jobs given to the three contractors who had provided the labor and materials necessary for the renovation of Roberto's basement. While the minutes of the Trustee meetings mention the work, they do not indicate that the award of the contract to Bismark, A & M, and Stavola Manson was the result of a competitive bidding process. Pivirotto testified that he had an oral, handshake contract to provide the maintenance services for the Health Plan building and annex. Furthermore, several of the invoices from Stavola Manson bore notations directing them to Roberto's attention. This evidence could have appropriately been considered by the jury

9. Over objection, Pfaffenberger was permitted to provide the reason why the material charge sheets, purchase orders, and invoices contained the Moore Tool job number when the materials were actually used at Roberto's home. He testified that he did so at Stavola's direction. This testimony was not admitted for the truth of the matter asserted, but only to explain why Pfaffenberger took the action he did, and the jury was so instructed.

10. Roberto claims that the absence of a direct communication between himself and Stavola renders the evidence insufficient as a matter of law. The absence of a direct communication between Roberto and Stavola, however, goes to the weight, not the sufficiency, of the evidence that the jury considered in finding that Roberto's receipt of the electrical services was in violation of § 1954.

in determining whether there was a nexus between the gratuities given to Roberto and his duties as a Trustee.[11]

Roberto points to his decision to veto the construction of the medical van garage, which would have resulted in a benefit to Bismark Construction, r-conn., Inc., A & M Piping, and Stavola Manson, as evidence that "the free work received by Mr. Roberto was not graft." (Def.'s Mem.Supp. Mot.J. Acquittal at 7). The jury was, however, entitled to weigh and reject this evidence in rendering its verdict.

*United States v. Palmeri,* 630 F.2d 192 (3rd Cir.1980), *cert. denied,* 450 U.S. 967, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981) does not require a different result in this case, and Roberto's reliance on the Third Circuit's reversal of Flen Chestnut's conviction is misplaced.

Roberto contends that, like Chestnut, there was insufficient evidence concerning his "knowledge or participation in the scheme." *Id.* at 206; *see* (Def.'s Mem. Supp.Mot.J. Acquittal at 2). For the following reasons, the Court holds that *Palm-*

*eri*'s discussion of the sufficiency of the evidence against Chestnut is inapposite to Roberto.

*United States v. Palmeri* involved a protracted and detailed loans (and kickbacks)-for-deposits scheme carried out by individuals who were directly or indirectly associated with the International Brotherhood of Teamsters Local 945 Pension, Welfare, and Severance Funds.[12] The multiple defendants were prosecuted for violations of 18 U.S.C. § 1954, which served not only as a substantive offense but also as a predicate offense for 18 U.S.C. §§ 1962(c) and (d) (RICO). *See Palmeri,* 630 F.2d at 198 n. 3.

Moreover, the defendants in *Palmeri,* unlike Roberto, were prosecuted under the "with intent to be influenced" (quid pro quo) prong of section 1954, not under the "because of" prong,[13] in addition to sections 1962(c) and (d).[14]

Finally, and most significantly, the Third Circuit derived the language that Roberto relies upon ("knowledge or participation in the scheme") from its discussion of the proof necessary to convict under sections

11. The later contracts awarded to the same contractors who renovated the Health Plan building and Roberto's basement placed Roberto in precisely the type of situation that Congress wished to prevent with section 1954, that is, a Trustee who received free work on his home was in a position to return the favor by influencing the award of the contracts without a bidding process, which obviously was not in the best interests of the beneficiaries of the plan to which he had a fiduciary duty. Whether he actually provided a special favor, as discussed *supra* at 949 & n. 2, is not necessary for a conviction under the "because of" prong of § 1954, and, at the least, Roberto had a conflict of interest which could have affected his fidelity to the beneficiaries of the plan that he was charged to administer.

12. During [a three-year period], nine area banks received more than $1,200,000 from the union in savings deposits and investments in certificates of deposit, while at the same time extending nearly three[-]quarters of a million dollars in loans to participants in the scheme or their nominees. The banks made little or no effort to collect the loans that they had extended for fear of jeopardizing future deposits or renewals of current deposits by the local.
*United States v. Palmeri,* 630 F.2d at 194–95.

13. Under the scheme, Palmeri would contact officers of banks and indicate to them that Local 945 was interested in obtaining certificates of deposit in large face amounts from certain banks. During these conversations and with varying degrees of bluntness, Palmeri would suggest that he or persons close to him were in need of loans. The bank officers, operating on the basis of the implied *quid pro quo,* would grant the loan with little or no meaningful evaluation of the loan application. Soon thereafter, Cariello would contact the officer to inquire about interest rates, and a deposit check on one of the union's funds would promptly arrive bearing Cariello's signature.
*United States v. Palmeri,* 630 F.2d at 195 (emphasis in original); *see also id.* at 199 n. 3 ("To establish a violation of § 1954, the [G]overnment must prove that the defendant served in one of the positions specified in the first part of the statute, and that he solicited or received certain benefits with intent to be influenced in his dealings with the employee benefit plan."); *id.* at 199 (discussing "with intent to be influenced").

14. "Section 1962(c) was the subject of count two of the indictment. Subsection (d) of § 1962 proscribes conspiracies to violate subsection (c), and was the subject of count one of the indictment." *Palmeri,* 630 F.2d at 199 n. 3.

1962(c) and (d), not under section 1954.[15] Indeed, nowhere in the "because of" prong of section 1954 do the words "knowledge or participation in the scheme" appear, and it would be unwarranted to add another essential element to a statute which is not present on its face. The Third Circuit, however, overturned Chestnut's section 1954 conviction without elaboration and on the basis of its finding of insufficiency under section 1962's requirement of knowledge or participation in the scheme.[16] This Court declines to do the same. For that reason and for the reasons stated previously, the Defendant is not entitled to a judgment of acquittal.

## CONCLUSION

The evidence, viewed as a whole, was sufficient for the jury rationally to conclude beyond a reasonable doubt that Defendant Roberto was guilty of receiving or soliciting a gift or thing of value because of his duties as a plan Trustee in violation of 18 U.S.C. § 1954. The Defendant's motion for a judgment of acquittal is therefore denied.

SO ORDERED.

---

**15.** Although the [G]overnment must establish at least two acts of racketeering to prove a "pattern of racketeering activity" in violation of the statute, it may link a particular defendant to that *pattern* by producing evidence that shows his knowledge and participation in the scheme. In this case the [G]overnment did establish an ongoing pattern of racketeering activity. To obtain convictions, it also had to prove that each defendant was voluntarily connected to that pattern and performed at least two acts in furtherance of it. *United States v. Palmeri,* 630 F.2d at 203 (emphasis in original) (citations omitted); *see also id.* at 204 ("We conclude that the [G]overnment presented evidence sufficient to demonstrate repeated participation by every appellant but Chestnut in the pattern of illegal activity.").

**16.** [The Government] submitted no evidence tending to prove Chestnut's knowledge or participation in the scheme. That he benefited from the loans for deposits plan is clear; what is unclear is his knowing participation in it. He cannot be held liable if, for instance, he received the loans merely because the principals in the scheme liked him or thought he needed money. Only if he knew the true basis for the loans, and participated in the plan, has he run afoul of § 1954 and thus § 1962. The [G]overnment simply failed to provide that connection. Accordingly, Chestnut's conviction will be reversed on both the substantive and conspiracy counts. *United States v. Palmeri,* 630 F.2d at 206.