**UNITED STATES of America**

v.

**JONNET, Elmer J.**

**Appeal of Elmer JONNET.**

**No. 84–3681.**

United States Court of Appeals, Third Circuit.

Argued April 30, 1985.

Decided May 6, 1985.

Erwin N. Griswold (Argued), Jones, Day, Reavis & Pogue, Washington, D.C., J. Clayton Undercofler, III, Daniel F. Ryan, III, James I. Devine, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for Elmer Jonnet.

J. Alan Johnson, U.S. Atty., Paul J. Brysh, Asst. U.S. Atty. (Argued), Pittsburgh, Pa., for the U.S.

Before GIBBONS and HIGGINBOTHAM, Circuit Judges and NEWCOMER, District Judge *.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

Elmer Jonnet appeals from a judgment of sentence imposed following his conviction of three counts of false testimony under oath, 18 U.S.C. § 1623 (1982), arising from his testimony in a deposition for a civil action to which he was a party. The trial court denied his motion for a new trial. 597 F.Supp. 999. Both the trial court and this court denied bail pending appeal. We hold that Jonnet is entitled to a new trial, and thus reverse.

### I.

Jonnet, a real estate developer who owns Jonnet Development Corporation, negotiated with Consolidated Rail Corporation (Conrail) in 1979 for the purchase of Conrail's Pittsburgh Pennsylvania Station. On January 8, 1980, Jonnet and Kenneth Williams, on behalf of Conrail, signed an agreement of sale to Jonnet Development Corporation for $2.1 million. Jonnet paid a $100,000 deposit. The January 8, 1980 agreement was expressly contingent on approval by Conrail's senior management and Board of Directors. On May 8, 1980 Conrail's senior management rejected the contract. Thereafter Conrail solicited bids. The bid solicitation letter required that bids be submitted by noon on July 1, 1980, and it reserved the right to reject any and all bids at Conrail's sole discretion.

Jonnet told Conrail officials that, because Conrail had held his deposit for months, and because he had expended time and money developing plans for his building project, he should be permitted to meet the best bid submitted. About noon on July 1, 1980, Jonnet arrived at Conrail's office and met with Kenneth Williams. Williams had already opened other bids, and Jonnet asked him what amount others had bid. At that point, the events occurred which eventually resulted in Jonnet's indictment for perjury.

According to Jonnet, he told Williams that Williams' superior, John Jaeger, said he could have the bid information. Williams called Jaeger, apparently to confirm this, and with Jaeger on the phone, turned to Jonnet and said, "It takes $2,500,000 to buy it." Jonnet agreed to buy the property for $2,500,000, and Williams told Jaeger,

---

* Hon. Clarence C. Newcomer, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

"we just sold the building to Jonnet for $2,500,000." Jonnet, Williams and a Conrail employee, Hindman, then went into a conference room, and Williams began to fill in the first page of a typewritten agreement with handwritten inserts. Hindman took the first page, containing the handwritten inserts, to another room and returned fifteen minutes later with a first page containing typewritten inserts. Jonnet, meanwhile, was going through the remainder of the contract with Williams. He crossed out a provision on page 6 that made the contract contingent on the approval of the Conrail Board of Directors.

Williams' testimony conflicted with Jonnet's. Williams agreed that Jonnet came to the Conrail office on July 1, 1980, and that a contract form was filled out calling for a purchase by Jonnet at a price of $2.5 million, but contends that the provision making the contract contingent on approval by the Conrail Board of Directors was not stricken, and that the contract called for an increase in the down payment at the time of Board approval.

Jonnet proceeded with the preparation of plans for construction at the site. In August of 1980, however, the Urban Redevelopment Authority (URA) of the City of Pittsburgh offered Conrail $2.75 million for the property. In September of 1980, Jaeger of Conrail told Jonnet that Conrail had agreed to sell to URA. He refused Jonnet's offer to increase the purchase price to $2.8 million.

Late in 1980, Jonnet Development Corporation brought suit in the Court of Common Pleas of Allegheny County against Conrail for specific performance of the July 1, 1980 contract. Several months later, Jonnet Development Corporation brought suit in the United States District Court for the Western District of Pennsylvania against Conrail, URA, and several business organizations allied with URA, charging that they had conspired, in violation of the federal antitrust laws, to deprive the plaintiff of the Penn Station development opportunity.

In connection with the federal court antitrust action Jonnet was deposed on three separate occasions. On May 19, 1981, he testified that the agreement he signed on July 1, 1980 provided for a $25,000 down payment, and did not include an additional $75,000 payment on approval of the Board of Directors. On May 22, he testified that he crossed out the paragraph making the contract contingent on approval by the Conrail Board of Directors on all copies while at the Conrail Office. He also testified that the typewritten inserts on the contract which he authenticated during the deposition were made before he left the Conrail office. These three items of testimony are the basis of the three-count indictment charging that Jonnet made false statements under oath in violation of 18 U.S.C. § 1623 (1982).

## II.

During the trial the government produced testimony from Conrail witnesses supporting its version of the events of July 1, 1980, and its version of the July 1, 1980 contract. The government also produced the testimony of the court reporter who transcribed Jonnet's deposition testimony. The reporter testified that Jonnet was sworn, and had testified as set forth in the deposition transcripts. The reporter also testified that there were several transcription errors, which were identified, but that the transcripts were otherwise accurate. In fact, however, there was an additional transcription error, to which more particular reference will be made later. Moreover, the court reporter had called this additional error to the attention of the Federal Bureau of Investigation well in advance of the trial and reference to it was included in an FBI report. For reasons which do not appear of record, this additional transcription error was not called to the attention of Jonnet's attorneys before or during the trial. The deposition transcripts were marked in evidence, but the court, on the objection of Jonnet's counsel, ruled that only certain relevant portions could be read to the jury, and only excerpts containing those relevant portions should

be permitted in the jury room. Those portions admitted as relevant did not include the page containing the transcription error.

Jonnet testified in support of his version of the events of July 1, 1980, and of his version of the contract. Of critical significance is his testimony to the effect that Hindman typed up the contract in the form on which Jonnet relied.

The court instructed the jury that, in weighing the credibility of witnesses' testimony, inconsistency in a witness's testimony "may or may not cause you to disregard such testimony." The court also instructed the jury to consider the extent to which each witness might be affected by the verdict.

After the jury returned a guilty verdict, counsel for Jonnet learned that, without request by the jury or notice to counsel, the entire transcripts of the deposition were delivered to the jury and were examined in the course of the jury's deliberations. Jonnet moved for a new trial, contending that the presence of the entire transcripts of deposition in the jury room was highly prejudicial. He relied particularly on that portion containing the uncorrected transcription error. During the deposition Jonnet was asked:

> Q. You mentioned that Mr. Hindman was not the one who wrote the agreement as you recall it, is that correct?

The answer, as transcribed, reads:

> A. He made an attempt. I don't know whether he scratched one out or not. I know he wanted to make an attempt to scratch one out and then finally *I* typed one up.

(emphasis supplied). It is undisputed that at the deposition Jonnet testified not "finally *I* typed one up," but rather "finally *he* typed one up." The version of events to which he testified at trial was that Hindman typed up the insertions. That version is consistent with his actual deposition testimony, but inconsistent with the version set forth in the transcript. Thus the jury

had before it, as a result of an error by an employee of the court, evidence from which it could conclude that Jonnet had given, under oath, conflicting versions of the events which occurred during the critical July 1, 1980 meeting.

The trial court denied Jonnet's new trial motion on the ground that the error of allowing the entire deposition transcript to go to the jury during its deliberations, despite the court's contrary ruling, was harmless. In making that ruling, the court considered affidavits and testimony of some jurors establishing that the transcripts were in the jury room.[1] In reliance on Fed.R.Evid. 606(b), the court excluded testimony by jurors about the effect the transcripts had on their deliberations.

### III.

We note at the outset that this is not a case in which counsel for the defendant failed to make an objection, in a form satisfying Fed.R.Crim.P. 51, to the presence of the disputed evidence in the jury room. Counsel objected to the entire deposition transcripts going to the jury, and that objection was sustained. *Compare, United States v. Friedland,* 660 F.2d 919, 928 (3d Cir.1981). Nor was this a case in which defense counsel could in any way be deemed responsible for the excluded materials reaching the jury. On this record it is undisputed that the error was solely that of an employee of the district court. Thus this is not a case in which the "plain error" standard of Fed.R.Crim.P. 52(b) applies. Rather, the issue presented must be analyzed under the harmless error standard of Fed.R.Crim.P. 52(a). *United States v. Hans,* 738 F.2d 88, 91–93 (3d Cir.1984). That rule screens from reversal only those errors which do not affect substantial rights. The Supreme Court, interpreting the same rule formerly embodied in the harmless error statute, observed that

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from

---

1. Two jurors submitted affidavits indicating that the deposition transcripts were delivered to the jury room, and that the jurors read the transcripts.

the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed.2d 1557 (1946).[2] In applying the *Kotteakos* standard of grave doubt as to the effect of the error on the verdict, we must consider that in this instance the error consists of permitting inadmissible materials with evidentiary significance to get to the jury. That is so because Fed.R.Evid. 606(b) prohibits an inquiry into the jury's deliberative processes. Thus, if the materials did have potential evidentiary significance, for purposes of Fed.R.Crim.P. 52(a), we must act on the assumption that one or more jurors took them into account in arriving at a verdict.

In *Government of the Virgin Islands v. Joseph,* 685 F.2d 857, 864 (3d Cir.1982), this court, applying the plain error standard of Fed.R.Crim.P. 52(b), which is more generous to the government than the Rule 52(a) standard applicable here, held that the inadvertent admission to the jury room of two documents not admitted into evidence containing admissions inconsistent with the theory of Joseph's defense, required a new trial. Since the objection to the admission of the transcripts was in this case at all times preserved, this error is *a fortiori* not harmless.

The trial court, denying the new trial motion, concluded that the error was harmless, because for the most part Jonnet's deposition testimony was consistent with the version of the transaction on which he

consistently relied. That analysis, however, ignores the significance of credibility judgments. In this case, Jonnet and the Conrail witness testified to diametrically opposed versions of the critical events which transpired on July 1, 1980. Jonnet, not the Conrail witness, was charged with false swearing. The court instructed the jury that if it found that he lied in one respect, the jurors could infer that his other testimony was not credible. The statement in the transcript was identified by the court reporter as an accurate record of Jonnet's prior testimony under oath and, as recorded, the testimony is inconsistent with that given by Jonnet at trial. Given the nature of the charge—false swearing—the direct conflict between Jonnet's testimony and that of the Conrail witnesses, and the court's instruction on credibility, the jury could well have thought: "O what a tangled web we weave when first we practice to deceive!"[3] Thus it is not possible to say "with fair assurance .... that the judgment was not substantially swayed by the error, [and] it is impossible to conclude that substantial rights were not affected." *Kotteakos v. United States,* 328 U.S. at 765, 66 S.Ct. at 1248. A new trial is required.

### IV.

Jonnet advanced two other grounds for a new trial, both of which the trial court also rejected. First, he contended, and still contends, that the failure of the government to disclose that the court reporter had reported the key transcription error to the FBI violated due process. *See United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We need not address this contention, for a resolution in Jonnet's favor on due process grounds would give him no more relief than the new trial which we have already concluded must be held.

---

**2.** We assume, arguendo, that the error here is not of constitutional dimensions, and thus that the prosecutor was not required to prove beyond a reasonable doubt that it did not contribute to the verdict. See *Chapman v. California,*

386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d .705 (1967). Under the *Chapman* standard the outcome would be the same.

**3.** Sir Walter Scott, *Marmion,* (1808) St. 17.

Jonnet also urges that the court erred in excluding evidence tending to show that the City of Pittsburgh was opposed to the sale by Conrail to Jonnet and influenced Conrail to back out of the July 1, 1980 deal. Jonnet contends that this evidence was relevant, within the meaning of Fed.Evid.R. 401, because it might persuade the jury that Conrail had a motive to falsify the version of the contract which it presented as authentic. We agree that the evidence was relevant. The court excluded it pursuant to Fed.R.Evid. 403, as likely to confuse the jury. Jonnet contends that this ruling was an abuse of the discretion vested in the trial court by Rule 403. As with the alleged *Brady* violation, we note that a ruling in Jonnet's favor on this ground would produce no more than a new trial. Unlike that alleged violation, the claimed error in the court's Rule 403 ruling might recur at such a trial. However, the court will exercise its discretion with respect to the proffered evidence on a different record and what we say here with respect to the exercise of discretion under Rule 403 may not be controlling. Thus we decline to address the question whether the court abused its discretion in excluding evidence pursuant to Rule 403.

### V.

The judgment appealed from will be reversed and the case remanded for a new trial. Because Jonnet was denied bail pending appeal the mandate shall issue forthwith so that he may be promptly admitted to bail pending that trial.