## Commonwealth v. Hoke

*Christopher J. Serpico, assistant district attorney,* for the commonwealth.
*Walter M. Phillips,* for defendant.

BIESTER, *J.,* February 28, 1988—The above-captioned matter, now before us on defendant's

post-trial motions in arrest of judgment and for a new trial, presents us with essentially an issue of first impression in the courts of our commonwealth. The issue is whether the erroneous entry and brief stay into the jury room during deliberations of an exhibit, which had not been admitted into evidence, but had been in view of the jury for an extended period of time in the courtroom, is grounds for a new trial. Our review of the limited case law which addresses similar issues strongly suggests and we determine that, in the present factual setting, the error does not entitle defendant to a new trial.

On April 27 and 28, 1987, defendant was tried before a jury which convicted him of aggravated assault, recklessly endangering another person, and leaving the scene of an accident involving death or personal injury. The jury acquitted Mr. Hoke of the charges of involuntary manslaughter and a second charge of simple assault. Defendant filed timely post-verdict motions. We received briefs and heard oral argument. We now enter our opinion.

We begin with a review of the evidence in a light most favorable to the verdict-winner, the commonwealth.

At trial the jury heard testimony from several witnesses regarding the November 2, 1986 automobile accident which gave rise to the criminal charges in this case. The accident, which occurred in a residential development of Northampton Township, caused a fatal head injury to the victim, Steven Chartan. Several witnesses testified that they observed a blue automobile, identified as defendant's Corvair, in the vicinity of the victim's residence on the afternoon of November 28, 1986. The Corvair was said to be noisy and travelled at a speed of approximately 40 to 45 miles per hour in the vicinity of the accident scene. Immediately following the acci-

dent the victim's Oldsmobile was observed in the middle of the street with the driver's door open. The victim was observed face down in the roadway. A pile of gravel was also observed in the roadway, located outside the victim's residence. The gravel extended the width of the street and testimony indicated that automobiles frequently drove on nearby lawns to negotiate the gravel piled in the roadway.

Mr. Hoke was questioned extensively concerning the circumstances surrounding the fatal accident of November 28, 1986. Testifying as to his recollection of the underlying event which was the basis for the criminal charges here, Mr. Hoke stated that he stopped his vehicle before reaching a mound of gravel which traversed the street. In order to continue on Post Road, he decided to circumvent the gravel mound by driving upon a residential lawn. After driving his Corvair upon the lawn his vehicle re-entered the roadway. At that point Mr. Hoke observed a vehicle exit a Post Road residence. The vehicle backed out into Post Road and parked in the middle of the roadway, approximately fifty feet in front of Mr. Hoke's vehicle.

Soon thereafter a man named Dr. Steven Chartan, the victim in this case, emerged from the vehicle which remained parked on Post Road. When the victim approached Mr. Hoke's vehicle, Mr. Hoke apologized for driving upon his lawn. Mr. Hoke did not comply with Dr. Chartan's request to see Mr. Hoke's license and registration. Mr. Hoke testified that during this confrontation with Dr. Chartan, Hoke was concerned about the fact that Hoke possessed neither an inspection sticker nor valid insurance.

Mr. Hoke testified that he was scared as Dr. Chartan returned to his own vehicle parked in the middle of Post Road. Mr. Hoke decided to leave the

scene. He proceeded to drive in the direction of Dr. Chartan's vehicle. As Mr. Hoke approached, Dr. Chartan jumped onto the passenger's side hood of defendant's Corvair. Dr. Chartan banged upon the windshield and twisted the wipers. Mr. Hoke testified that his vehicle was still moving when Dr. Chartan jumped off Hoke's car; whereupon Mr. Hoke "sped up and drove away."

Mr. Hoke observed in his rearview mirror that the victim was lying motionless in the street. Rather than check upon the victim's condition or notify the police, Mr. Hoke left the scene, whereupon he proceeded to the homes of his parents and his girlfriend. He mentioned the event to no one.

Northampton Township Police Officer James Caldwell testified that upon his arrival at the accident scene he observed the victim lying face down in the roadway. The victim was not responsive to verbal communication. His clothing was pushed up. There was a laceration on the victim's back. Blood was being discharged from both of the victim's ears. The officer observed vomit below the victim's mouth and the victim's body was surrounded by a pool of blood.

During Officer Caldwell's testimony the commonwealth had a diagram marked for identification purposes. The diagram was used for illustrative purposes during Officer Caldwell's testimony. It was never received into evidence.

Although additional testimony was presented by the commonwealth, it is the diagram which serves as the basis of defendant's first post-trial argument. We will examine the argument at this juncture of our opinion.

The record reflects that at 3:30 p.m. on April 28, 1987 the jury retired to the jury room to deliberate upon its verdict. After being informed by our minute

clerk that the unadmitted diagram was mistakenly delivered into the jury room by another court employee, we reconvened with counsel in the courtroom at 4:03 p.m. At that time, in absence of the jury, the following conversation took place:

THE COURT: The record should reflect that I was in chambers about a minute and a half ago. Our minute clerk advised me that he had just learned that juror no. 4 requested to see the diagram which had been on this board from [the tipstaff]. [The tipstaff] believes that it was with the jury between five and eight minutes.

As soon as I heard about it, I directed it to be brought out. It was brought out and now rests in that corner.

What's your pleasure?

MR. PHILLIPS: Your Honor, this diagram is not in evidence.

THE COURT: That is correct.

MR. PHILLIPS: It had a marking on it about which there is some dispute, and Your Honor sustained defense's objection. I feel compelled that I must ask and move for a mistrial at this time because of what occurred.

THE COURT: All right. May I see the diagram: (Exhibit provided to the court)

THE COURT: All right, We'll mark this as C-1, court exhibit 1.

(Whereupon, exhibit C-1 is received into evidence.)

THE COURT: I looked at it carefully. In and of itself it contains no English language with reference to any mark on it. There are some modest notations. The location of the mark which was referred to earlier is totally ambiguous, and didn't specify anything whatsoever. And under the circumstances

I'm prepared to give curative instructions if counsel wishes.

Do you wish me to give curative instructions of any kind?

MR. PHILLIPS: May I just state for the record, Your Honor, the markup on the diagram, so the record is clear, is on Post Road between 104 and 108, and next to a vehicle marker which appears in the diagram.

THE COURT: Which vehicle marker was to represent the location of the victim's vehicle when it was at rest.

MR. PHILLIPS: I would disagree, Your Honor, because I think that mark contends where the victim's vehicle was when it was at rest was on the other side of —

THE COURT: I don't know about that. But I see some kind of representation of a vehicle there.

MR. PHILLIPS: But the mark in question — the point that I wanted to make is that the commonwealth had argued this was a yaw mark and wanted to introduce it and argue to the jury that that mark was made by Mr. Hoke's car when he violently took a left turn in order to throw Mr. Chartan, in front of the jury.

THE COURT: None of that ever came to the jury. And, therefore, it's just a mark on a diagram at this point, C-1. Do you want me to give curative instruction of any kind?

MR. PHILLIPS: Yes, I do.

THE COURT: Very well.

MR. PHILLIPS: Although I would like to state for the record that I don't think — I think it simply — it puts me, defense counsel, in a dilemma because I don't think your instructions can cure the error that's committed. And I think it's a matter of law that to allow an exhibit to go into the jury room

that was not admitted as evidence constitutes a basis for mistrial.

THE COURT: Depends on what happens with respect to the exhibit, what the exhibit is and what it shows. And, therefore, we will give curative instructions if you wish. The defendant should be notified so he's present during the curative instructions.

MR. PHILLIPS: I'll notify him.

THE COURT: All right. Bring in the jury.

(Jury present at 4:10 p.m.)

MR. PHILLIPS: Your Honor, may we approach the bench with Mr. Serpico?

THE COURT: Yes.

(The following discussion was held at side bar out of the hearing of the jury):

MR. PHILLIPS: Your Honor has indicated you would be prepared to give curative instructions. My question to the court would be, what curative instructions would they be essentially?

THE COURT: I would simply tell them it should never have gone out with them. Nothing that they have observed with respect to it should be taken into account with respect to their deliberation and verdict; that it was a mistake to go out. I retrieved it as soon as I heard about it, and they should ignore it completely. That's in fairness to both sides.

(After a discussion with counsel at side bar concerning the merits of curative instructions, we addressed the jury. The following occurred):

THE COURT: Members of the jury, a mistake has occurred. Now, the question is whether we can rectify that mistake. And for this I need your cooperation.

Our tipstaff is an experienced tipstaff, and he simply made a mistake. The case has gone on for two days. You should not have seen the diagram. It

was not an exhibit in the case. You must not base any part of your decision-making process upon anything in or about that diagram. Nothing. And that's in fairness to the commonwealth and to defendant. Both. It was not entered as an exhibit and, therefore, must not be considered by you.

So what I need to know, having told you that, is whether you can satisfactorily go on to complete your deliberations, setting aside anything that you may have observed with respect to that document. If you can, we can continue; and you can finish your deliberations. Otherwise, we cannot.

Have you selected a foreperson?

THE JURY: Yes.

THE COURT: Who is the foreperson, please?

(Juror no. 3 indicating.)

THE COURT: All right. Sir, what I need is to know from a report from you whether this jury can decide, will decide this case without reference to that diagram. If so, you may continue deliberations and may finish this case, I'd ask you to do that, do that promptly and in the privacy of the jury room. If you report back to me that you will, then we will finish.

All right, gentlemen.

(Jury excused at 4:18 p.m.)

THE COURT: Once again, I would ask the courtroom to be cleared.

(Courtroom cleared at this time.)

• • •

(Recess taken at this time.)

(Jury present.)

THE COURT: Mr. Savre, have you and your colleagues decided whether you can proceed?

THE FOREMAN: Yes, we have, Your Honor. We feel we can definitely proceed without the evidence that was given to us.

THE COURT: And without reference to it?

THE FOREMAN: Without reference to it.

THE COURT: You'll strike it from your consideration?

THE FOREMAN: Yes.

THE COURT: Reswear this jury.

THE CLERK: Ladies and gentlemen, please rise.

(Jury rises.)

THE CLERK: Ladies and gentlemen, you and each of you swear by almighty God, and those of you who affirm do declare and affirm, that you will well and truly try the issue joined between the Commonwealth of Pennsylvania and William Hoke II and without any reference or consideration whatsoever to the exhibit — I'm sorry, to the diagram you've just seen, a true verdict give according to the evidence. If so, please say I do?

THE JURY I do.

THE COURT: That's a solemn oath. I accept it as such, and you may resume your deliberations.

Again, we will clear the courtroom.

(Jury excused and courtroom cleared at 4:23 p.m.)

(The following occurred without the jury.)

MR. PHILLIPS: Do I understand that Your Honor is denying my motion for mistrial?

THE COURT: I'm denying your motion for mistrial. And I've taken every step I can possibly take to see to it that this jury conscientiously decides this case without reference to that document.

We initially note that the document, drawn to scale, contained several pieces of data which were relevant to the commonwealth's case including the location of the victim's house and driveway; the location of the raised pile of stones which traversed the roadway in front of the victim's house; the loca-

tion of the vicitm's body; and a mark which was attributed to the victim's car. The document was not admitted into evidence because of the existence of a skid mark on the diagram. The skid mark was first discovered by police two days after the accident. The commonwealth informed us that they would not be offering expert testimony which would connect the skid mark to the vehicle of either defendant or the victim. We sustained the objection of Mr. Hoke's defense attorney and, consequently, the diagram was not admitted into evidence.

During jury deliberations a court employee mistakenly submitted the unadmitted diagram to the jury. Immediately upon learning of this error we directed that the diagram be removed from the jury room. It is our estimate that the diagram remained in the jury room for a period of approximately five to eight minutes.

We polled the jury to determine whether deliberations could continue without reference to the diagram. The jury foreperson informed us that the jurors believed they could "definitely proceed" without reference to the diagram and that it would be stricken from their consideration. The jury was then resworn to consider the case without any reference to the diagram.

We consider this issue to be a matter of first impression as our state appellate courts have not yet ruled upon a factual situation in which an unadmitted exhibit is inadvertently allowed into the jury room for a relatively short period of time and withdrawn before deliberations concluded. Although we find a small degree of instructive value in a decision by our Superior Court, we turn to the federal courts for guidance since the United States Courts of Appeals have had the opportunity to adjudicate cases which closely parallel the issue now before us.

Even though we do not find definitive instruction by our Pennsylvania Appellate Courts on this matter, the Superior Court has reviewed the issue of whether a criminal defendant was entitled to a new trial when a juror improperly brought with him into the jury room his handwritten notes of the elements of the crimes charged. The court noted that it was improper for a juror to take notes during a trial and to use those notes in the jury room. Pa.R.Crim.P. 1113; *Commonwealth v. Pierce,* 453 Pa. 319, 322, 303 A.2d 371, 372 (1973); nonetheless, the court denied defendant's request for a new trial. *Commonwealth v. Maute,* 336 Pa. Super. 394, 485 A.2d 1138 (1984). The Superior Court held that in order for defendant to be entitled to a new trial he must establish that he has been prejudiced by the improper conduct. *Id.* at 405; 485 A.2d at 1144. Absent a showing of prejudice the Superior Court was unwilling to find merit in the defendant's argument for a new trial. *Id.*

In reviewing the federal cases decided by the United States Court of Appeals which reflect the issue now before us, we find guidance by a common thread which those cases offer. In analyzing the federal standard, we will discuss the pattern which emerges when those cases are reviewed. First, a brief review of each case is in order.

Defendant has directed our attention to *Dallago v. United States,* 427 F.2d 546 (D.C. Cir., 1969), one of the earliest cases to address this issue. In *Dallago,* defendant was charged with, and ultimately found guilty of, several violations of the Securities Act and the Securities and Exchange Act. During the trial, by agreement of counsel, certain portions of the Securities and Exchange file would not be offered as evidence and, thus, would not be allowed into the

318

jury room. However, for some unexplained reason, the portions of the file which had not been admitted into evidence were not deleted. The unadmitted portions of the file were placed in the jury's possession during deliberations. Although the court of appeals reversed the conviction, the reversal was the result of the court's conclusion from a review of the record that defendant was in fact prejudiced by the improper proceeding.

In analyzing whether the unadmitted evidence within the jury's possession was grounds for a new trial, the court noted, "it is perfectly plain that the jury room must be kept free of evidence not received during trial, and that its presence, *if prejudicial,* will vitiate the verdict." *Id.* at 553 (emphasis supplied).

In *United States v. Frieland,* 660 F.2d 919 (3d Cir., 1981) defendants were charged with, and ultimately convicted of, several charges relating to kickbacks. The court of appeals provided both the general rule and its accompanying exception with respect to when the presence of unadmitted exhibits in the jury room establishes grounds for a new trial. The rule and exception follows: "When exhibits not in evidence reach the jury, a new trial should not be ordered unless it is shown that the evidence was so prejudicial that the defendant was denied a fair trial." *Id.* at 928.

In *Government of Virgin Islands v. Joseph,* 685 F.2d 857 (3d Cir., 1982), involving convictions of assault, robbery and rape, the Court of Appeals cited *Dallago* and *Frieland* with approval. Furthermore, the court of appeals granted defendant's request for a new trial when it concluded that the unadmitted exhibits, which included a signed confession, were so highly prejudicial as to deprive the defendant of his rights to a fair trial. *Id.* at 864.

Both defense and prosecution direct our attention to *United States v. Jonnet,* 762 F.2d 16 (3d Cir., 1985). In *Jonnet* the trial court sustained a defense counsel objection as to the admission into evidence of a disputed exhibit. However, by way of an error on the part of a court employee, the exhibit improperly reached the jury. The error was not discovered by the court until after the jury returned a guilty verdict. In granting a new trial, the standard applied by the court of appeals was "whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Id.* at 20.

A noticeable pattern emerges when reviewing the foregoing federal cases with respect to the issue of whether defendant is entitled to a new trial. The paramount inquiry is whether the defendant was prejudiced by the presence in the jury room of an unadmitted exhibit. To grant defendant a new trial, prejudice must be shown. Therefore, a review of the circumstances in the present case is in order to discover whether Mr. Hoke was prejudiced by the presence of the unadmitted diagram in the jury room.

The disputed exhibit, a diagram, was not admitted into evidence. In fact, we sustained defendant's objection when the commonwealth was unable to offer expert evidence connecting a mark on the diagram to defendant's vehicle.

During the trial the jury had a clear view of the diagram as Officer Caldwell made references to it. The diagram had been marked for purposes of identification. The skid mark remained unexplained to the jury. The diagram was lacking any identifying references to the skid mark.

After the diagram was discovered within the domain of the jury room during the jury's deliberations, we immediately ordered its removal. The esti-

mated amount of time that the diagram remained in the jury room before its removal totalled between five and eight minutes.

Immediately following the removal of the diagram from the jury room, we inquired whether the jurors could proceed in their deliberations without reference to the unadmitted exhibit. Reflecting the response of the entire jury, the jury foreperson informed us "we feel we can definitely proceed" without reference to the diagram. As we were satisfied that the case could properly proceed, the jury was resworn and informed that their deliberations must not include any reference to the diagram.

We believe the presence of the diagram in the jury room in the present matter had no prejudicial effect upon the defendant's right to a fair trial. A review of all the evidence leads us to conclude that the defendant received a fair trial. We therefore deny his request for a new trial.

Although the diagram was improperly placed by a court employee in the jury room during deliberations, this case lacks any evidence of prejudice. Unlike the unadmitted confession in *Government of Virgin Islands v. Joseph, supra,* which was placed in the hands of the jury, the very nature of the diagram in the instant case, which the jurors had a full view of during trial, lacks any prejudicial impact upon defendant's rights to a fair trial. Furthermore, we note that the diagram was present in the jury room for a relatively inconsequential period of time at the outset of deliberations. We also took immediate precautionary measures to ensure that the diagram would not be a factor in the jury's deliberations.

Since we find that prejudice is a sine qua non of defendant's right to a new trial with respect to the issue now before us and since we find no evidence

of prejudice in this matter, we are compelled to deny defendant's motion for a new trial.

Defendant next argues that we erred in denying a requested jury charge on the justification defense. At trial Mr. Hoke requested that we charge the jury with respect to the application of the law on a defense of justification for leaving the accident scene. Defendant contends there was sufficient evidence on the record, specifically evidence that the victim had frightened the defendant, which would warrant a justification charge.

As to the issue of justification, our Supreme Court has provided:

"In order, then, to be entitled to an instruction on justification as a defense to a crime charged, the actor must first offer evidence that will show:

"(1) that the actor was faced with a clear and imminent harm; not one which is debatable or speculative;

"(2) that the actor could reasonably expect that the actor's action would be effective in avoiding the greater harm;

"(3) that there is no legal alternative which will be effective in abating the harm; and

"(4) that the legislature has not acted to preclude the defense by a clear and deliberate choice regarding the values at issue." *Commonwealth v. Capitolo*, 508 Pa. 372, 378, 498 A.2d 806, 808 (1985).

Our post-trial review of the factual history of this case affirms our belief that we were correct in ruling that a charge on the justification defense was not available to Mr. Hoke as a matter of law because the defense failed to establish the minimum requirements of that defense.

Mr. Hoke was in the protective confines of his vehicle at the point he claims the victim approached his car. On cross-examination Mr. Hoke testified

that the victim did not make any verbal or physical threats. Therefore, by Mr. Hoke's own testimony, the requisite factor that defendant be faced with a clear and imminent harm does not exist in this matter.

Notwithstanding the fact that a virtual endless list of reasonable alternative measures other than flight were available to the defendant, we find that the first factor for a justification charge as enunciated in *Commonwealth v. Capitolo, supra,* had not been established and, for the foregoing reasons, we deny defendant's post-trial motions with respect to the justification charge issue.

Defendant's final argument is that we erred when we charged the jury that in their deliberations flight by defendant may be considered as evidence of consciousness of guilt.

Our charge to the jury regarding flight follows:

"There was evidence, including the testimony of certain witnesses which evidence you will recall, which tended to show the defendant fled from the area. The defendant maintains he did so for reasons you will recall his testifying to. The credibility, weight and effect of this evidence is for you to decide.

"Generally speaking, when a crime has been committed and a person thinks he is or may be accused of committing it and he flees or conceals himself, such flight or concealment is a circumstance tending to prove the person is conscious of guilt.

"Such flight or concealment does not necessarily show consciousness of guilt in any case. A person may flee or hide for some other motive and may do so even though innocent.

"Whether the evidence of flight or concealment in this case should be looked at as tending to prove guilt depends upon the facts and circumstances of

this case and especially upon motives which may have prompted the flight or concealment. You may not find the defendant guilty solely on the basis of evidence of flight or concealment."

Our review of our instructions to the jury leads us to conclude that the charge accurately reflects the law with respect to flight as evidence of consciousness of guilt. See *Commonwealth v. Hailey,* 332 Pa. Super. 167, 173, 480 A.2d 1240, 1243 (1984). See also, *Commonwealth v. Osborne,* 433 Pa. 297, 302, 249 A.2d 330, 333 (1969).

We find sufficient evidence on the record to support a jury charge regarding flight, including defendant's own testimony that "I just wanted to get away from him [the victim] so I sped up and drove away." Mr. Hoke further testified that he could see in his rearview mirror that the victim was "lying on the ground." The next question by the deputy district attorney was, "So what did you do as a result?" to which Mr. Hoke responded "I left."

Notwithstanding other evidence presented to the jury, defendant's testimony alone clearly establishes evidence from which the jury could infer a consciousness of guilt from defendant's flight. We therefore conclude that the jury was properly charged.

For all the foregoing reasons we enter the following

## ORDER

And now, February 28, 1988, it is hereby ordered, directed and decreed that defendant's motions for a new trial and in arrest of judgment are denied.

Defendant is hereby ordered to appear before the undersigned for the imposition of sentence on

March 18, 1988 in courtroom no. 5 at 9 a.m. at the Bucks County Courthouse, Doylestown, Pa.